IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JAMES O. GREASON,

           Plaintiff,

    v.

GEORGIA DEPARTMENT OF
REVENUE, State of Georgia,
DOUGLAS J. McGINNITIE, in his
official capacity as Commissioner,
and ELLIE CIMAGLIA, in her
official capacity as Director of Human
Resources,

           Defendants.

CIVIL ACTION FILE NO.

1:11-CV-4506-TWT-JFK

## FINAL REPORT AND RECOMMENDATION

Plaintiff James O. Greason filed the above-styled employment discrimination action on December 27, 2011.  [Doc. 1].  Plaintiff Greason alleges that Defendants subjected him to race discrimination in violation of 42 U.S.C. § 1981, the Georgia Constitution, the Equal Protection Clause through 42 U.S.C. § 1983, and Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e, *et seq.* [Doc. 1, Counts One, Three, Four, and Six].  Plaintiff also alleges a "pattern and practice" of race discrimination in his Title VII and § 1981 claims.  [Counts One and

Three].  Plaintiff asserts claims for retaliation under Title VII and 42 U.S.C. § 1981, and a claim for age discrimination based on the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*  [Doc. 1, Counts Two, Three, and Five]. Plaintiff also alleges that Defendants "violated Plaintiff's right to due process of law" under the Georgia Constitution and violated his "right to employment without due process of law under Georgia law." [Doc. 1, Counts Six and Seven].  Finally, Plaintiff brings a state law claim for intentional infliction of emotional distress and a claim under Georgia's Whistleblower Act.  [Doc. 1, Count Eight].  Plaintiff asserts all of his claims against Defendant Georgia Department of Revenue and individual Defendants Douglas J. MacGinnitie[1] and Ellie Cimaglia in their official capacities.[2]  [Doc. 1]. Defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56 on Plaintiff's claims based upon the pleadings, statements of material facts, exhibits, and discovery materials submitted to the court.  [Doc. 50].

─────────────────────

[1]Although Plaintiff's complaint names "Douglas J. McGinnitie" as a Defendant, the correct spelling of his last name is "MacGinnitie." [MacGinnitie Affidavit ("Aff.") ¶ 1].   The court will use the correct spelling throughout this report and recommendation.

[2]In his complaint, Plaintiff Greason also named James Sowell and Timothy Mitchell as Defendants.  [Doc. 1].  However, all claims against Mr. Sowell and Mr. Mitchell have been dismissed, and the two individuals are no longer Defendants in this action.  [Docs. 22, 31, 40].

2

## I.     Facts

When evaluating the merits of a motion for summary judgment, the court must "view the evidence and all factual inferences raised by it in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-moving party." Comer v. City of Palm Bay, Florida, 265 F.3d 1186, 1192 (11th Cir. 2001). However, mere conclusions and unsupported self-serving statements by the party opposing summary judgment are insufficient to avoid summary judgment. See Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005). Therefore, the evidence presented by the parties having been evaluated in accordance with the foregoing principles, the following facts are deemed to be true for the limited purpose of evaluating Defendants' motion [Doc. 50] for summary judgment.

Plaintiff James Greason was hired to work at the Georgia Department of Revenue in 1984 as a Tax Specialist 1. He was promoted to Tax Specialist 3 in 1986, to Tax Specialist 4 in 1987, to Tax Specialist 5 in 1993, and to Manager 1 in 2001. [Defendants' Statement of Material Facts ("DSMF") ¶ 1]. In his role as Manager 1, Plaintiff worked in the Taxpayer Services Unit within the Compliance Division. [Plaintiff's Statement of Material Facts ("PSMF") ¶ 6]. The Taxpayer Services Unit was subsequently renamed the Special Collections Program Unit ("SCPU"). [PSMF

AO 72A

(Rev.8/82)

¶ 8].  The SCPU consisted of the Bankruptcy Section, the Offer-in-Compromise Program, the Problem Resolution Program, the Compliance Call Center, the Installment Section, and the Lottery Section.  [PSMF ¶ 10].  Plaintiff Greason was responsible for the day-to-day operation of the Offer-in-Compromise Program, the Bankruptcy Section, and the Problem Resolution Program.  He reported directly to the Deputy Commissioner of Compliance.  [PSMF ¶ 11].

Plaintiff filed previous employment discrimination lawsuits against the Department of Revenue around 1992 and in 1997.  At the end of both of those suits, he released any claims he may have had.  [DSMF ¶ 2].  Between 2000 and June 2011, Plaintiff did not file any charges of discrimination or make any internal complaints of discrimination.  [DSMF ¶ 3].

Ed Many served as Deputy Commissioner of the Department of Revenue until his retirement on December 1, 2010.  [Many Aff. ¶ 2].  Tim Jones was a Program Director who reported directly to Deputy Commissioner Many.  [Many Aff. ¶ 3; DSMF ¶ 9].  Mr. Jones stated that Plaintiff Greason was a good manager and assumed responsibility for managing the SCPU in Mr. Jones' absence.  [PSMF ¶ 12; Jones Aff. ¶ 5].  Mr. Jones also stated that he had complete confidence in Plaintiff to manage the SCPU.  [PSMF ¶ 13; Jones Aff. ¶ 5].

4

Mr. Jones retired in October 2009. [PSMF ¶ 16]. Mr. Many stated that at this time, the state government as a whole, including the Department of Revenue, was undergoing severe budgetary problems. Mr. Many saw Mr. Jones' retirement as an opportunity to save money by not replacing him. [Many Aff. ¶ 3; DSMF ¶ 5]. Mr. Many testified that he reviewed the organizational structure of the Compliance Division and determined that the Department could cover Mr. Jones' job duties by dividing them up among the staff. Mr. Many then assumed responsibility for Mr. Jones' direct reports and for the sections that Mr. Jones had been overseeing, including the SCPU. [Many Aff. ¶ 3; DSMF ¶ 6]. Deputy Commissioner Many testified that for those reasons, he decided not to fill Mr. Jones' Program Director position. [Many Aff. ¶ 3; DSMF ¶ 7]. Mr. Many made Plaintiff his direct report. [PSMF ¶ 19].

Mr. Jones stated that when he retired, he expected Plaintiff Greason to be promoted to the Program Director position and assume his duties and responsibilities. [PSMF ¶ 17; Jones Aff. ¶ 9]. When asked why he believes that he was not promoted to take over Tim Jones' former position in 2009, Plaintiff first referred to a pay increase that he allegedly did not get in 2001, and then further explained:

> I think because of my history [of complaints with the Department] that they did not want me to be promoted. I think because Tim was liked by

5

> Mr. Many that he allowed him to promote me to the manager position.
> Otherwise, you know, I probably wouldn't have gotten that job.

[DSMF ¶ 8; Plaintiff's Deposition ("Pla. Dep.") at 46-48].

Deputy Commissioner Many testified that in November 2010, the Department of Revenue needed to fill a Program Manager position that was responsible for managing all of its regional offices statewide. [Many Aff. ¶ 4; DSMF ¶ 10]. Mr. Many testified that he selected John Coleman for that position because Mr. Coleman was already serving as the acting Program Manager and had a long career of progressively responsible positions in the Collections area of the organization, including serving as Regional Manager of both the Augusta Regional Office and the Savannah Regional Office. [Id.]. According to Mr. Many, Mr. Coleman's knowledge of and experience with the regional offices made him well qualified for the Program Manager position. [Id.]. Mr. Many testified that Plaintiff did not have similar experience and that Plaintiff was not someone that he would have considered for that position. [Many Aff. ¶ 4; DSMF ¶ 11]. When asked why he believes that he was not promoted to the Program Manager position in November 2010, Plaintiff testified:

> Simply because I had applied for those position throughout and I was never given the opportunity. There was a series of positions that I had applied for from 2001 to 2009 and '10 and I was not given any of those positions. When I applied for the position they would take it off the

6

board. . . .  Wouldn't even allow the position to be filled.  There was one instance where I had applied for a taxpayer service position and this was the director's position.  I was interviewed for the job but I was not given the position.  The commissioner called my assistant, someone on my staff down [named Denise Samuel, who is black], made her the acting director and then six months later gave her the position.

[DSMF ¶ 13; Pla. Dep. at 56-57].

Deputy Commissioner Many testified that before he retired on December 1, 2010, the internal working titles (as opposed to the official job titles kept by the State Merit System or State Personnel Board) for three of his direct reports – Jim Sowell, Dorothy Black, and Anita DeGumbia – were changed to Assistant Director.  This change was made in order to better reflect the work that they were already performing.  However, they did not take on new positions, duties, or pay.  [Many Aff.  ¶¶ 2, 5; DSMF ¶ 14].  Mr. Many testified that these were not open positions to which Plaintiff could have been promoted.  [Many Aff. ¶ 5; DSMF ¶ 15].  When asked why he believes that Jim Sowell's being named an Assistant Director was based on Plaintiff's race or age, Plaintiff testified, "Again my history and understanding of the department and how they operated."  [DSMF ¶ 16].

Mr. Many testified that when he retired in December 2010, he knew that no one was going to be filling his position right away, so he needed to arrange to have his

7

duties assumed by the existing staff.  He arranged for the people and functions that had been reporting directly to him to begin reporting to his assistant directors.  [Many Aff. ¶ 6; DSMF ¶ 17].  Mr. Many stated that among the reassigned areas was the SCPU, which was not dismantled but was merely rearranged for its various functions to begin reporting to Mr. Many's assistant directors in his upcoming absence.  The SCPU's Bankruptcy and Offer-in-Compromise groups began reporting directly to Dorothy Black, and other groups began reporting to Jim Sowell.  [Many Aff. ¶¶ 2, 6; DSMF ¶ 18].  When asked why he believes that the alleged dismantling of the SCPU was based on race or age, Plaintiff explained:

> Because [Mr. Many] did not give me the position.  He did not give me a raise for the decade that I worked in the position.  He would not allow me to take on the responsibilities of that position.  And the fact that the program was successful and to have that program abolished like it was and dismantled that way lead me to feel that I was discriminated on.

[DSMF ¶ 20; Pla. Dep. at 64].

Douglas MacGinnitie became Commissioner in 2011.  Shortly thereafter, in January 2011, the Department of Revenue implemented an initiative to streamline its Offer-in-Compromise ("OIC") Program, which allows taxpayers the opportunity to work out compromises on their outstanding tax liabilities.  [MacGinnitie Aff. ¶ 3; DSMF ¶ 21; PSMF ¶ 23].  Mr. MacGinnitie testified that there existed at that time a

8

backlog of approximately 700 "OIC reject cases," which are those in which the Department has initially rejected the taxpayer's compromise offer. The procedures were then changed to reduce the backlog by refining the investigation, recommendation, and write-up processes. [MacGinnitie Aff. ¶ 3; DSMF ¶ 22]. According to Mr. MacGinnitie, among the changes was a revision to the reconsideration process by which a taxpayer can ask the Department to reconsider its initial decision to reject the taxpayer's compromise offer. The reconsideration requests had previously been handled by the same group in the Compliance Division who had originally rejected the offer. [MacGinnitie Aff. ¶ 4; DSMF ¶ 23]. Mr. MacGinnitie testified that under the new procedure, reconsideration requests began to be handled by the Office of Tax and Policy. Taxpayers now generally have a right to an administrative hearing on rejected offers. Compliance Collections Assistant Director Dorothy Black was given authority to accept or reject offers of up to $100,000 without getting approval from her supervisor. [MacGinnitie Aff. ¶¶ 4, 5; DSMF ¶ 24].

Plaintiff alleges that he made objections to the OIC Program's proposed revisions at a meeting in March of 2011. [DSMF ¶ 25]. Plaintiff testified that during the meeting, he stated that the changes that were being proposed were not feasible and could not be accomplished by his staff. [PSMF ¶ 25; Pla. Aff. ¶ 24]. Jim Sowell

9

allegedly advised Plaintiff that if his staff did not perform the changes then they could find work somewhere else. [Id.]. Plaintiff stated that Mr. Sowell was not his supervisor and did not understand the program enough to make the determination about what changes would work for Plaintiff's staff. [PSMF ¶ 26; Pla. Aff. ¶ 25]. According to Plaintiff, after he made his comments during the March 2011 meeting, he was never invited to another meeting. [PSMF ¶ 27; Pla. Aff. ¶ 26]. All of the changes that were made to the OIC Program were made without input from Plaintiff or his staff. [PSMF ¶ 28; Pla. Aff. ¶ 26].

Once it was clear that the proposed changes to the OIC Program would be adopted, Dorothy Black went to Commissioner MacGinnitie, along with Jim Sowell, to discuss her proposal for some personnel changes that she felt would make her unit more efficient. [MacGinnitie Aff. ¶¶ 6, 7; DSMF ¶ 26]. Ms. Black is African-American and is 61 years of age. [DSMF ¶ 27]. The personnel changes proposed by Ms. Black included a reduction-in-force plan that would eliminate Plaintiff Greason's manager position overseeing the Bankruptcy and OIC groups within the Compliance Division. [MacGinnitie Aff. ¶¶ 6, 7; DSMF ¶ 26]. Plaintiff was the only person affected by the proposed reduction-in-force. [PSMF ¶ 31; Pla. Aff. ¶ 30]. Mr. MacGinnitie testified that the day-to-day operation of the Bankruptcy

10

Unit was managed by a supervisor and two team leads with no direct supervision from Plaintiff.  As a result of the new streamlined process for the OIC Program, the Bankruptcy Unit became a stand-alone function reporting to Ms. Black. [MacGinnitie Aff. ¶ 8; DSMF ¶ 28].  According to Mr. MacGinnitie, the new procedures eliminated Plaintiff's responsibility to process OIC reconsiderations, which accounted for approximately 90% of cases of rejected offers.  Plaintiff's previous function of making recommendations to accept or reject OIC offers after an OIC Specialist made a recommendation also became obsolete as the ultimate responsibility to approve or reject offers became Ms. Black's.  [MacGinnitie Aff. ¶ 9; DSMF ¶ 29].  Mr. MacGinnitie testified that with these streamlining changes, there was no longer a need for the management position that Plaintiff was occupying.  [MacGinnitie Aff. ¶ 9; DSMF ¶ 30].

The Commissioner must approve any proposed reduction-in-force within the Department of Revenue before it can go forward.  The plan then must be sent to the State Personnel Administration, a separate state agency that will review the plan and determine whether it is in accordance with the rules and regulations of the State Personnel Board.  [MacGinnitie Aff. ¶ 10; DSMF ¶ 31].  Commissioner MacGinnitie stated that he reviewed the reduction-in-force plan carefully and decided to approve it

11

because, based on the changes to the OIC Program, there was no longer a need for the management position held by Plaintiff.  [MacGinnitie Aff. ¶ 11; DSMF ¶ 32].  The Commissioner of the State Personnel Administration, Joe Doyle, approved the Department of Revenue's proposed reduction-in-force plan on March 10, 2011. [Cimaglia Dep. at 60-63, Ex 1; MacGinnitie Aff. ¶ 12; DSMF ¶ 33].

On March 15, 2011, at a meeting attended by Plaintiff, Dorothy Black, and Director of Human Resources Ellie Cimaglia, Plaintiff was notified that his position would be eliminated as of April 16, 2011.  [PSMF ¶ 29; DSMF ¶ 34].  In a letter dated March 15, 2011, Plaintiff was informed that he could pursue other positions in state government.  In addition, he was given information about where to find out about available jobs, and he was referred to the Department of Revenue's Workplace Consultant for the Compliance Division, Josh Elzy, who could assist him with that process.  [DSMF ¶ 35].  Plaintiff did not talk to Mr. Elzy, and he did not apply for any other jobs in state government.  [DSMF ¶ 36].  Plaintiff was also notified that he could request a copy of the reduction-in-force plan and that he could appeal to the State Personnel Board if he believed that the Department of Revenue did not implement the reduction-in-force in accordance with the plan as approved by the Commissioner of the State Personnel Administration, but he did not do either.  [DSMF ¶ 37].  When asked

what due process rights he was not afforded, Plaintiff testified that he did not receive enough notice that his job would be eliminated and that "they" could have moved him to the Bankruptcy Unit for "another couple of years" until he retired.  [DSMF ¶ 38; Pla. Dep. at 106-07].  Plaintiff retired and started drawing benefits from the Employees' Retirement System of Georgia within a few months after he left the Department of Revenue.  [DSMF ¶ 39].

Ellie Cimaglia became Director of Human Resources for the Department of Revenue in February 2011.  Both Ms. Cimaglia and Mr. MacGinnitie stated that Ms. Cimaglia has no knowledge of any positions or promotions Plaintiff may have applied for and that she was not privy to discussions that resulted in reorganizing Plaintiff's unit or eliminating his position.  [Cimaglia Dep. at 22, 38, 55; MacGinnitie Aff. ¶ 14; DSMF ¶ 43].  When asked about his pattern and practice claim at his deposition, Plaintiff testified that the Department of Revenue had let several black managers go, but he also admitted that he did not know who made those supposed decisions or the circumstances surrounding their alleged departures.  [DSMF ¶ 44; Pla. Dep. at 98-99]. Ms. Cimaglia testified that approximately 68 percent of the Department of Revenue's approximately 1,220 employees are African-American, and that almost 70 percent are over the age of 40.  [Cimaglia Dep. at 44-47 and errata sheet; DSMF ¶ 45].

13

Plaintiff signed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on June 8, 2011. On the charge, Plaintiff indicated race as the only basis of discrimination. He also indicated that his discharge was the only act of discrimination and that April 16, 2011, was the only date of discrimination. [DSMF ¶ 46; Pla. Dep. at 99, Ex. 5].

Additional facts will be set forth below as they become necessary for discussion of Plaintiff's claims.

## II. Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (amended 2010). Rule 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2552 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed

14

verdict where there can be but one reasonable conclusion.  See Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2511 (1986).

The movant bears the initial burden of asserting the basis of his motion, and that burden is a light one.  See Celotex, 106 S. Ct. at 2553.  The movant is not required to negate his opponent's claim.  See id.  Rather, the movant may discharge this burden merely by "'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case."  Id. at 2554.

When evaluating a motion for summary judgment, the court must view the evidence and factual inferences in the light most favorable to the nonmoving party. See Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1309 (11th Cir. 2001). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 106 S. Ct. 1348, 1356 (1986).  Instead, "the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor."  Fickling v. United States, 507 F.3d 1302, 1304 (11th Cir. 2007) (citing Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990)).

The court will apply these standards in ruling on Defendants' motion for summary judgment.

15

## III.    Discussion

### A.    Plaintiff's Abandoned Claims

Plaintiff Greason has filed a response brief in opposition to Defendants'

summary judgment motion. [Doc. 54]. However, Plaintiff has only offered arguments

in support of his ADEA age discrimination claim and his Title VII claims for

retaliation and race discrimination. [Id.]. Plaintiff acknowledges that summary

judgment must be granted on his remaining claims, that is, those based on state law,

42 U.S.C. § 1981, and 42 U.S.C. § 1983. [Doc. 54 at 32 n.3]. Furthermore, Plaintiff

has not opposed Defendants' summary judgment motion on his claims against Douglas

MacGinnitie and Ellie Cimaglia, whom he has named as Defendants in their official

capacities. As Plaintiff named the Georgia Department of Revenue as a defendant, his

Title VII and ADEA claims against the individual Defendants in their official

capacities are redundant. See Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir.

1991) ("Because suits against a municipal officer sued in his official capacity and

direct suits against municipalities are functionally equivalent, there no longer exists a

need to bring official-capacity actions against local government officials. . . ."));

Wheeles v. Nelson's Elec. Motor Services, 559 F. Supp. 2d 1260, 1267 (M.D. Ala.

2008) (holding that plaintiff's Title VII and ADEA claims against individual

defendants in their official capacities were redundant and due to be dismissed because employer was named as defendant); <u>Portera v. State of Alabama Dep't of Finance</u>, 322 F. Supp. 2d 1285, 1287 (M.D. Ala. 2004) (holding that any Title VII claim against governmental supervisor "in his official capacity is redundant since the Finance Department is already a defendant").   It is, therefore, **RECOMMENDED** that Defendants' summary judgment motion [Doc. 50] be **GRANTED** on Plaintiff's claims brought pursuant to state law, 42 U.S.C. § 1981, and 42 U.S.C. § 1983, and that Douglas MacGinnitie and Ellie Cimaglia be **DISMISSED** as Defendants.  Plaintiff's remaining claims are against Defendant Georgia Department of Revenue for age discrimination based on the ADEA and for retaliation and race discrimination based on Title VII.

### B.     Plaintiff's ADEA Claims

Although Plaintiff has asserted age discrimination claims based on the ADEA, sovereign immunity provided by the Eleventh Amendment to the United States Constitution protects the Department of Revenue, as an agency of the State of Georgia, from being sued.  The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by

Citizens or Subjects of any Foreign State." "Absent a legitimate abrogation of immunity by Congress or a waiver of immunity by the state being sued, the Eleventh Amendment is an absolute bar to suit by an individual against a state or its agencies in federal court." Gamble v. Florida Dep't of Health and Rehabilitative Services, 779 F.2d 1509, 1511 (11th Cir. 1986). In Kimel v. Florida Board of Regents, 120 S. Ct. 631 (2000), the United States Supreme Court held that the ADEA did not abrogate a state's Eleventh Amendment immunity from suit. Accordingly, the undersigned **RECOMMENDS** that Defendant's summary judgment motion [Doc. 50] be **GRANTED** on Plaintiff's ADEA age discrimination claims against the Georgia Department of Revenue.

### C. Title VII Claims

#### 1. Administrative Requirements

Plaintiff Greason's remaining claims are against the Department of Revenue for retaliation and race discrimination based on Title VII. Defendant argues that most of Plaintiff's Title VII claims are barred because he failed to exhaust his administrative remedies. "Before filing a Title VII action in court, a plaintiff first must file a charge of discrimination with the EEOC." Anderson v. Dunbar Armored, Inc., 678 F. Supp. 2d 1280, 1303 (N.D. Ga. 2009) (citing Gregory v. Georgia Dep't of Human Resources,

355 F.3d 1277, 1279 (11th Cir. 2004)). The Eleventh Circuit has held that a "'plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'" Gregory, 355 F.3d at 1280 (citations omitted); accord Eastland v. Tennessee Valley Auth., 714 F.2d 1066, 1067 n.9 (11th Cir. 1983) ("The starting point for determining the permissible scope of the judicial complaint is the EEOC charge and investigation."); Waldemar v. American Cancer Soc'y, 971 F. Supp. 547, 553 (N.D. Ga. 1996) ("Claims omitted from the EEOC charge may still be litigated when 'reasonably related' to those claims brought in the EEOC charge."). Thus, "[i]f not reasonably related, the court is precluded from considering claims not raised in the EEOC complaint." Waldemar, 971 F. Supp. at 553. The reason for this rule is that under the statutory scheme of Title VII, the EEOC is given the first opportunity to investigate the alleged discrimination and attempt to achieve voluntary compliance. See Sanchez v. Standard Brands, Inc., 431 F.2d 455, 466 (5th Cir. 1970). "Only if the EEOC fails to achieve voluntary compliance will the matter ever become the subject of court action." Id.

It is well settled that alleging a distinct discriminatory motive as the reason for a defendant's actions constitutes a new theory of recovery. See, e.g., Davis v. Sodexho, Cumberland College Cafeteria, 157 F.3d 460, 463-64 (6th Cir. 1998) (claim

19

of age discrimination and claim of race discrimination are different theories of recovery each requiring administrative exhaustion); <u>Randel v. United States Dep't of the Navy</u>, 157 F.3d 392, 395 (5th Cir. 1998) (racial discrimination claim is separate and distinct from claim of retaliation, each requiring administrative exhaustion).  Plaintiff Greason filed his charge of discrimination with the EEOC on June 8, 2011, and checked the box indicating that he had been subjected to discrimination based on race.  [Doc. 50, Ex. J; Pla. Dep. at 99, Ex. 5].  In the charge, Plaintiff alleged the following:  "On April 16, 2011, I was discharged by Ellie Cimaglia, Human Resources Director.  I was informed by Ms. Cimaglia that my job was being eliminated due to the agency reorganizing.  I feel that I have been discriminated against because of my race (African-American). . . ."  [Doc. 50, Ex. J; Pla. Dep. at 99, Ex. 5].  Plaintiff completed an intake questionnaire with the EEOC in which he stated, "I believe that the actions were taken because I am black, 60 years old and has [sic] a history of filing discriminatory actions."  [Doc. 50, Ex. K].  In a supplemental letter with the EEOC, Plaintiff alleged: "I feel that I was removed from my position because of my age.  I'm 60 years old."  [Doc. 50, Ex. L; Doc. 54, Ex. 1].  Plaintiff also discussed in the supplemental letter a history of his work record with the Department of Revenue as well as a number of changes and adverse actions that had taken place.  [<u>Id.</u>].  These

20

included Plaintiff's allegations that he had not been promoted to Program Director in October 2009, and that on December 1, 2010, the Compliance Division was reorganized and James Sowell was made Assistant Director.  [Id.].  Based on these documents filed with the EEOC, the court finds that Plaintiff has satisfied the exhaustion requirements for his Title VII race discrimination and retaliation claims.

Pursuant to 42 U.S.C. § 2000e-5(e), a Title VII litigant must file a charge of discrimination with the EEOC within 180 days of the alleged discriminatory act.  See, e.g., Zipes v. Trans World Airlines, 102 S. Ct. 1127 (1982).  Title VII provides, in pertinent part, "A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e).  The Eleventh Circuit has held that a failure to file a charge with the EEOC within the 180-day time period bars a plaintiff's Title VII claims.  See Pijnenburg v. West Georgia Health Sys., Inc., 255 F.3d 1304, 1305 (11th Cir. 2001) ("It is settled law that in order to obtain judicial consideration of [a Title VII] claim, a plaintiff must first file an administrative charge with the EEOC within 180 days after the alleged unlawful employment practice occurred."); Ross v. Buckeye Cellulose Corp., 980 F.2d 648, 662 (11th Cir. 1993).

21

As noted *supra*, Plaintiff filed his EEOC charge on June 8, 2011. [Pla. Dep. at 99, Ex. 5]. This means that any discriminatory employment action that occurred before December 11, 2010, is time barred because it is outside the 180-day period. The adverse employment actions which form the basis of Plaintiff's Title VII claims are: his non-selection to a Program Director position after the retirement of Tim Jones in October 2009; John Coleman's selection for a Program Manager position in November 2010; the change of James Sowell's job title to Assistant Director before Deputy Commissioner Ed Many's retirement on December 1, 2010; the reorganization of the Special Collections Program Unit before Mr. Many's retirement; and the elimination of Plaintiff's position in March 2011 which led to his termination in April 2011. [Doc. 1 ¶¶ 78, 79, 85, 94-97, 101, 102, 120-25; Doc. 54 at 6, 9-10; Many Aff. ¶¶ 3-7; DSMF ¶¶ 4-13; Pla. Dep. at 56-57]. All of the complained-of actions are discrete acts, and "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." National R.R. Passenger Corp. v. Morgan, 122 S. Ct. 2061, 2072 (2002). The only alleged adverse employment action that occurred on or after December 11, 2010, was the March 2011 elimination of Plaintiff's position which resulted in his termination effective April 16, 2011. [DSMF ¶ 34; Doc. 54 at 6]. Because the other acts were outside the 180-day period, they are

22

time barred.  As a result, the court **RECOMMENDS** that Defendant's motion [Doc. 50] for summary judgment be **GRANTED** on Plaintiff's Title VII claims of retaliation and race discrimination *except* for those claims based on the termination of Plaintiff's employment.[3]

### 2.     Title VII Race Discrimination Claims

Plaintiff Greason alleges that his position was eliminated and he was terminated from his employment on the basis of his race, African-American.  Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race. . . ."  42 U.S.C. § 2000e-2(a)(1).  Plaintiff asserts in his complaint

---

[3]Even if Plaintiff's Title VII claims based on the other adverse actions were not barred, the court would recommend that summary judgment be granted on them. Plaintiff has failed to offer evidence that would allow a reasonable jury to conclude that the adverse employment actions were taken in retaliation for his complaints of discrimination or were based on his race.  As discussed *infra*, the last time Plaintiff engaged in protected activity was in 2000, nine years or more before any of the alleged adverse actions.  No causal connection in support of a retaliation claim can be established when there is such a long period of time between the protected activity and the adverse action.  With regard to Plaintiff's race discrimination claims based on the time barred actions, Plaintiff's testimony makes it clear that he is unable to point to any evidence that would create a reasonable inference of a racially discriminatory motive in any of the complained-of actions.  [DSMF ¶¶ 8, 13, 16, 20; Pla. Dep. at 46-48, 56-57, 64].

23

that "Defendants' conduct toward Plaintiff constitutes a pattern and practice of ongoing and continuing race discrimination in employment which is unlawful, pursuant to Title VII. . . ." [Doc. 1 ¶ 130]. "In Davis v. Coca–Cola Bottling Co., 516 F.3d 955 (11th Cir. 2008), the Eleventh Circuit held that a private litigant cannot maintain a pattern or practice claim unless it is brought as a class action and the class is ultimately certified." Rollins v. Alabama Community College Sys., 814 F. Supp. 2d 1250, 1316 (M.D. Ala. 2011). Plaintiff Greason has not brought his Title VII pattern and practice claim as a class action. Accordingly, the undersigned **RECOMMENDS** that summary judgment be **GRANTED** on Plaintiff's Title VII pattern and practice claim.[4]

Plaintiff has also asserted a Title VII racially disparate treatment claim based on his termination. In a disparate treatment action, the plaintiff carries the burden of demonstrating that the defendant has unlawfully discriminated against him. See Texas Dep't of Community Affairs v. Burdine, 101 S. Ct. 1089, 1093-95 (1981). Because

---

[4]Moreover, "[i]n a pattern and practice case, the plaintiff must prove, normally through a combination of statistics and anecdotes, that discrimination is the company's standard operating procedure." EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1274 (11th Cir. 2000) (citation and internal quotation marks omitted). Plaintiff has not come close to making this showing. When asked about his pattern and practice claim at his deposition, Plaintiff testified that the Department of Revenue had let several black managers go, but he also admitted that he did not know who made those supposed decisions or the circumstances surrounding their alleged departures. [DSMF ¶ 44; Pla. Dep. at 98-99].

24

Plaintiff relies on circumstantial evidence to support his employment discrimination claim, the court will use the framework articulated in McDonnell Douglas Corp. v. Green, 93 S. Ct. 1817, 1824-25 (1973), to evaluate his claim.  The McDonnell Douglas framework governs the allocation of burdens and order of presentation and proof, and they are as follows: (1) the plaintiff has the burden of proving a *prima facie* case of discrimination; (2) if the plaintiff succeeds in proving the *prima facie* case, the burden (of production) shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the action taken against the employee; and (3) should the defendant carry this burden, the plaintiff must have an opportunity to prove that the legitimate reason offered by defendant was a pretext for discrimination.  See id.

Plaintiff can establish a *prima facie* case of race discrimination in his termination by showing that: (1) he is a member of a racially protected class; (2) he was qualified to do the job; (3) he was subjected to an adverse job action; and (4) he was replaced by a person outside his protected class or he was treated less favorably than a similarly situated individual outside his protected class.[5]  See Maynard v. Board of Regents, 342

---

[5]In Jones v. Bessemer Carraway  Med. Ctr., 137 F.3d 1306 (11th Cir.), partial superseding opinion on denial of rehearing, 151 F.3d 1321 (11th Cir. 1998), the Eleventh Circuit emphasized that the proper comparison is to employees that are "'similarly situated in all relevant respects.'"  Id. at 1311 (quoting Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997)).

25

F.3d 1281, 1289 (11th Cir. 2003).  In a reduction-in-force which results in the plaintiff's discharge, such as in the present case, the plaintiff may also establish the final element by "producing sufficient evidence from which a rational fact finder could conclude that his employer intended to discriminate against him in making the discharge decision." Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1331 (11th Cir. 1998).  Defendant acknowledges that Plaintiff Greason is able to establish the first three *prima facie* elements because he is African-American, was terminated from his employment with the Department of Revenue in April 2011, and was qualified for his manager position overseeing the Bankruptcy Section and Offer-in-Compromise ("OIC") Program. [Doc. 50 at 16; MacGinnitie Aff. ¶¶ 6, 7; DSMF ¶ 26].  The court finds, however, that Plaintiff has failed to offer evidence establishing the final *prima facie* element.

Plaintiff does not identify anyone who replaced him after his position was eliminated. [Doc. 54]. Plaintiff has also failed to offer evidence that Defendant treated similarly situated employees outside his classification more favorably than it treated him.  When Plaintiff was asked at his deposition why he believes that the elimination of his job was based on race or age, he testified:

> I think that the very time I opened my mouth in that meeting [about proposed changes to the OIC Program] that doomed me.  I think that Jim

26

> Sowell made it his point to see that I was gone.  I think that they felt that
> the best way to get rid of me was to do a RIF [reduction-in-force].

[DSMF ¶ 40; Pla. Dep. at 83].   When Plaintiff was asked how Ellie Cimaglia

discriminated against him based on race or age, he testified:

> I think that she conspired with James Sowell and Tim Mitchell to get me
> out of there. . . .  I think that what they did is they probably studied it,
> went through the books and found out the best way to handle it.  I mean
> the reorganization that they set up was a ruse so they needed some way
> to deal with it.  It was obvious to me that the reduction-in-force had no
> plan.

[DSMF ¶ 42; Pla. Dep. at 96].  While Plaintiff may honestly believe that he was treated

unfairly, his testimony reveals a complete lack of evidence that Defendant intended to

discriminate against him on the basis of his race.

Plaintiff's arguments in support of his race discrimination claim consist mostly

of conclusions and allegations that are unsupported by the record.  Plaintiff, for

example, writes, "The Department of Revenue has a history of appointing non-

minorities to upper level positions when well-qualified minorities are available." [Doc.

54 at 19].   Plaintiff offers no citation to the record supporting this conclusory

allegation.  The Eleventh Circuit has held, "[M]ere conclusions and unsupported

factual allegations are legally insufficient to defeat a summary judgment motion."

Ellis, 432 F.3d at 1326 (citation omitted); accord Ratliff v. DeKalb County, Georgia,

27

62 F.3d 338, 341 (11th Cir. 1995) ("[P]laintiffs seeking to avoid summary judgment . . . must present specific nonconclusory facts that would support a jury verdict against the particular defendant on discriminatory intent.").

To the extent Plaintiff has offered arguments that include citations to the record, the court finds that these are insufficient to create an inference of race discrimination with regard to his termination.  Plaintiff wrote in his response brief, "After the Plaintiff was terminated from employment, there continued to be a need for an OIC manager and the work was transferred to the Levy Department and managed by Merrill Jacobson, the white male that the Plaintiff complained about in his supplemental letter with the EEOC."  [Doc. 54 at 30].  The evidence cited by Plaintiff in support of this assertion is his own letter to the EEOC.  [Doc. 54, Ex. 1].  But, as Defendant notes, the letter "provides no foundation to show that Plaintiff has any first-hand knowledge of work being done by Merrill Jacobson after Plaintiff left the Revenue Department."  [Doc. 57 at 14].  Moreover, even if some of Plaintiff's prior duties were performed by Mr. Jacobson after Plaintiff's termination, this fact would not permit a reasonable inference that racial animus motivated the decision to eliminate Plaintiff's manager

28

position overseeing the Bankruptcy Section and OIC Program.[6] For these reasons, the court finds that Plaintiff Greason is unable to establish a *prima facie* case of race discrimination in his termination.

Assuming *arguendo* that Plaintiff were able to establish a *prima facie* case, the burden of production would then shift to Defendant to articulate some legitimate, nondiscriminatory reason for the action taken against Plaintiff.   See Combs v. Plantation Patterns, 106 F. 3d 1519, 1528 (11th Cir. 1997) (citing McDonnell Douglas, 93 S. Ct. at 1824; Burdine, 101 S. Ct. at 1094).  "'[T]o satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had *not* been motivated by discriminatory animus.'"   Id. (quoting Burdine, 101 S. Ct. at 1096) (emphasis in original).  A "'defendant need not persuade the court that it was actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'"   Id. (quoting Burdine, 101 S. Ct. at 1094).  The defendant's burden in the rebuttal stage is "'exceedingly light.'"

---

[6]This is especially true in light of other evidence in the record that undermines Plaintiff's racially discriminatory termination claim. For example, the individual who recommended to the Commissioner that Plaintiff's job be eliminated was his supervisor, Dorothy Black, who is African-American.  [Pla. Dep. at 49;DSMF ¶ 27].

Walker v. NationsBank of Florida N.A., 53 F.3d 1548, 1556 (11th Cir. 1995) (quoting

Perryman v. Johnson Products Co., Inc., 698 F.2d 1138, 1142 (11th Cir. 1983)).

Defendant alleges that in 2011, shortly after Douglas MacGinnitie became

Commissioner, the Department of Revenue implemented an initiative to streamline its

OIC Program, which allows taxpayers the opportunity to work out compromises on

their outstanding tax liabilities.  [MacGinnitie Aff. ¶ 3; DSMF ¶ 21].  To reduce the

backlog of "OIC reject cases," which are those in which the taxpayer's compromise

offer has been rejected, the procedures were changed by refining the investigation,

recommendation, and write-up processes.  [MacGinnitie Aff. ¶ 3; DSMF ¶ 22].

According to Mr. MacGinnitie, among the changes was a revision to the

reconsideration process by which a taxpayer can ask the Department to reconsider its

initial rejection of the taxpayer's compromise offer.  [MacGinnitie Aff. ¶ 4; DSMF ¶

23].  Under the new procedure, reconsideration requests began to be handled by the

Office of Tax and Policy, a separate section of the Department.   Compliance

Collections Assistant Director Dorothy Black was given authority to accept or reject

offers of up to $100,000 without getting approval from her supervisor.  [MacGinnitie

Aff. ¶¶ 4, 5; DSMF ¶ 24].

Once it was clear that these procedural changes to the OIC Program would be adopted, Ms. Black proposed some personnel changes to Commissioner MacGinnitie that she felt would make her unit more efficient. [MacGinnitie Aff. ¶¶ 6, 7; DSMF ¶ 26]. Ms. Black's proposed changes included a reduction-in-force plan that would eliminate the manager position overseeing the Bankruptcy Section and OIC Program within the Compliance Division. This was the position then occupied by Plaintiff Greason. [MacGinnitie Aff. ¶¶ 6, 7; DSMF ¶ 26]. As a result of the new streamlined process for the OIC Program, the Bankruptcy Unit became a stand-alone function reporting to Dorothy Black. [MacGinnitie Aff. ¶ 8; DSMF ¶ 28]. According to Mr. MacGinnitie, the new procedures eliminated Plaintiff's responsibility to process OIC reconsiderations and to accept or reject OIC offers because the ultimate responsibility to approve or reject offers became Ms. Black's. [MacGinnitie Aff. ¶ 9; DSMF ¶ 29]. Commissioner MacGinnitie stated that he reviewed the reduction-in-force plan carefully and decided to approve it because, based on the changes that the Department of Revenue had implemented to streamline the OIC Program, there was no longer a need for the management position held by Plaintiff. [MacGinnitie Aff. ¶ 11; DSMF ¶ 32]. Defendant has obviously satisfied its burden of articulating a legitimate, nondiscriminatory reason for eliminating Plaintiff's position.

31

Once a defendant meets its burden of production, "the presumption of discrimination created by the McDonnell Douglas framework 'drops from the case,' and 'the factual inquiry proceeds to a new level of specificity.'" Combs, 106 F.3d at 1528 (quoting Burdine, 101 S. Ct. at 1094-95 & n.10).  The plaintiff then "has the opportunity to demonstrate that the defendant's articulated reason for the adverse employment action is a mere pretext for discrimination." Holifield, 115 F.3d at 1565 (citing McDonnell Douglas, 93 S. Ct. at 1825).  Plaintiff's demonstration of pretext merges with his "ultimate burden of showing that the defendant intentionally discriminated against the plaintiff." Holifield, 115 F.3d at 1565 (citing St. Mary's Honor Ctr. v. Hicks, 113 S. Ct. 2742, 2749 (1993)).  This task is a highly focused one.

The court "must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct[.]'" Combs, 106 F.3d at 1538 (quoting Cooper-Houston v. Southern Ry. Co., 37 F.3d 603, 605 (11th Cir. 1994)).  Plaintiff "'may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" Jackson v. State of

Alabama State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005) (quoting

Burdine, 101 S. Ct. at 1095).  In order to establish pretext through the indirect method,

the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions in the employer's proffered legitimate reasons for its

action that a reasonable factfinder could find them unworthy of credence."  McCann

v. Tillman, 526 F.3d 1370, 1375-76 (11th Cir. 2008) (citations and internal quotation

marks omitted).

Plaintiff Greason has not offered evidence sufficient to carry his burden at the

pretext stage.  Plaintiff contends that "when the Department submitted the reduction-

in-force plan to the State Personnel Administration for review and approval, the plan

proposed the separation of one classified employee in the Bankruptcy Unit.  It did not

mention the Offer-in-Compromise Program."  [Doc. 54 at 25].  This is incorrect.  The

Department of Revenue's proposal submitted to the State Personnel Administration

discussed the changes in procedures to the OIC Program and stated that this was the

reason for the abolishment of the manager position.  [Black Dep., Ex. 3].  The letter

cited by Plaintiff was the letter from the State Personnel Administration approving the

Department of Revenue's reduction-in-force.  [Doc. 54, Ex. 2].  The fact that the State

33

Personnel Administration's approval letter did not mention the OIC Program is not relevant to the pretext inquiry.

Plaintiff also contends that the Commissioner was mistaken about the number of OIC reconsideration cases and that the Commissioner "did not understand that the cases he was referring to were the 756 cases from the OIC Procedures/Payment Plan letter dated February 3, 2011 [which] referred to [the] number of cases that the entire Offer in Compromise Program had to work. . . ." [Doc. 54 at 28]. In addition, Plaintiff claims that the "purpose for the changes in the Office of Tax and Policy to handle OIC reconsiderations were [sic] to collect fees from the taxpayers through administrative appeals." [Doc. 35 at 29]. Finally, Plaintiff argues that he had managed the Bankruptcy Unit for over a decade and was the liaison for the Department of Revenue with the Law Department, trustees, and bankruptcy court. [Doc. 35 at 31]. According to Plaintiff, "Dorothy Black was not a lawyer neither did she understand bankruptcy law or have any experience." [Id.]. Instead, she "had to rely on Merrill Jacobson, a lawyer in the Compliance Division with bankruptcy experience. . . ." [Id.].

None of Plaintiff's assertions support a finding of pretext. The Commissioner's alleged misunderstanding about the number of OIC reconsideration cases, the collection of fees, and the job qualifications of his supervisor, Ms. Black, do nothing

34

to cast doubt on Defendant's proffered nondiscriminatory reasons for eliminating Plaintiff's manager position.   It is clear that Plaintiff did not believe that the Department should have made changes to the OIC Program.  He did not think that the changes were wise, and at a meeting in March of 2011, Plaintiff made objections to proposed revisions before they were put into effect.  [DSMF ¶ 25].  Similarly, in his response brief, as Defendants note, Plaintiff spent more time disagreeing with the rationale for eliminating his position than offering evidence of racial discrimination. However, "[a] plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason as long as the reason is one that might motivate a reasonable employer."  <u>Pennington v. City of Huntsville</u>, 261 F.3d 1262, 1267 (11th Cir. 2001) (citation and internal quotation marks omitted).  Furthermore, although Plaintiff believed that his position should not have been eliminated in light of his experience and knowledge compared to Ms. Black, his opinion about his own value as an employee is not germane to the pretext issue.  As the Eleventh Circuit has explained, courts "'must be careful not to allow Title VII plaintiffs simply to litigate whether they are, in fact, good employees.'"  <u>Alvarez v. Royal Atlantic Developers, Inc.</u>, 610 F.3d 1253, 1266 (11th Cir. 2010) (quoting <u>Rojas v. Florida</u>, 285 F.3d 1339, 1342 (11th Cir. 2002)).

35

"A plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by race." Springer v. Convergys Customer Mgmt. Group Inc., 509 F.3d 1344, 1349 (11th Cir. 2007) (citations and internal quotation marks omitted). Plaintiff has failed to offer any evidence that would permit a reasonable jury to conclude that Defendant's decision to eliminate his position was motivated by race. As discussed *supra*, Plaintiff is unable to establish a *prima facie* case, and even assuming he could, he cannot show that Defendant's proffered reasons are pretexts for racial discrimination. The undersigned, therefore, **RECOMMENDS** that Defendant's summary judgment motion [Doc. 50] be **GRANTED** on Plaintiff's Title VII disparate treatment race discrimination claim against the Georgia Department of Revenue.

### 3.     Title VII Retaliation Claim

Plaintiff Greason's final claim is one for retaliatory termination. Title VII acts to shield employees from retaliation for certain protected practices. Specifically, the statute provides, in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful practice by this subchapter, or because he has made a charge, testified, assisted, or

36

participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression.  Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311 (11th Cir. 2002); Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1454 (11th Cir. 1998).  The plaintiff "'need not prove the underlying claim of discrimination which led to [his] protest;' however, the plaintiff must have had a reasonable good faith belief that the discrimination existed."  Holifield, 115 F.3d at 1566 (quoting Tipton v. Canadian Imperial Bank of Commerce, 872 F.2d 1491, 1494 (11th Cir. 1989)).  Moreover, "[t]he causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated."  Pennington, 261 F.3d at 1266 (citations and internal quotation marks omitted).

Plaintiff is able to satisfy the first two elements of a *prima facie* case of retaliation.  He suffered an adverse employment action when the decision was made by Defendant in March 2011 to eliminate his managerial position, which resulted in his termination effective April 16, 2011.  [DSMF ¶ 34].  Plaintiff engaged in statutorily

protected expression when he filed previous employment discrimination lawsuits against the Department of Revenue around 1992 and in 1997. [DSMF ¶ 2]. Plaintiff also filed charges of discrimination and made internal complaints of discrimination against the Department from around 1998 up to 2000. [Pla. Dep. at 20-21, 99]. Between 2000 and June 2011, Plaintiff did not file any charges of discrimination or make any internal complaints of discrimination. [DSMF ¶ 3; Pla. Dep. at 20-21, 99]. On June 8, 2011, approximately two months after he was terminated, Plaintiff filed a charge of discrimination with the EEOC. [Doc. 50, Ex. J; Pla. Dep. at 20-21, 99, Ex. 5]. While this constitutes protected activity, it obviously cannot form the basis of Plaintiff's retaliatory termination claim because it occurred after his termination. Therefore, the last time Plaintiff engaged in protected activity relevant to the present retaliatory termination claim was around 2000. [Pla. Dep. at 20-21, 99].

The final *prima facie* element requires Plaintiff to show that his termination was causally related to his protected expression. As mentioned previously, the causal link requirement is broadly construed. See Meeks v. Computer Assocs. Int'l, 15 F.3d 1013, 1021 (11th Cir. 1994). When determining whether a causal link exists, the court is essentially looking to see if any inference of retaliation can be drawn from the circumstances surrounding the employer's action. See Morgan v. City of Jasper, 959

38

F.2d 1542, 1547 (11th Cir. 1992) ("To establish the causal connection between her protected activity and the adverse employment action, Morgan had to demonstrate that defendant was discriminatorily motivated, which she could do by circumstantial evidence.").  If an employer takes an adverse employment action against an employee shortly after becoming aware of the employee's protected expression, then the short amount of time between the two events, standing alone, may be enough to produce an inference of retaliation.  See Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000) ("The general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection.").  "The shorter the period between the two events, the stronger the inference that the adverse action was improperly motivated; conversely, a long period of time between the protected conduct and adverse-employment action will negate an inference that the adverse action was caused by the protected expression." Johnson v. Auburn University, 403 F. Supp. 2d 1101, 1113-14 (M.D. Ala. 2005).

      In the present case, Plaintiff engaged in protected activity in or around 2000, and he was terminated more than ten years later in April 2011.  This disparity is far too long to establish a causal link.  In Clark County School Dist. v. Breeden, 121 S. Ct.

39

1508, 1511 (2001), the Supreme Court stated that "mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action . . . must be 'very close[.]'"  The Eleventh Circuit has noted that the Supreme Court in Breeden, 121 S. Ct. at 1511, "cited with approval decisions in which a three to four month disparity was found to be insufficient to show causal connection." Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004).  Courts have routinely found that disparities much shorter than the one found in the present case were too far removed to permit an inference of a causal link.  See, e.g., Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) (three month disparity is insufficient to establish a causal connection); Higdon, 393 F.3d at 1221 (holding that "the three month period between the September 29 letter and the December 31 incident does not allow a reasonable inference of a causal relation between the protected expression and the adverse action").  Because more than a decade elapsed between Plaintiff's complaints of discrimination and his termination in April 2011, the court concludes that he is unable to establish the causal connection *prima facie* element.  It is, therefore, **RECOMMENDED** that Defendant's summary judgment motion [Doc. 50] be **GRANTED** on Plaintiff's Title VII retaliation claim.

40

## IV.   Conclusion

For the foregoing reasons and cited authority, the undersigned **RECOMMENDS** that Defendants' motion [Doc. 50] for summary judgment be **GRANTED** on all of Plaintiff's claims.

All pretrial matters have been concluded with the issuance of this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1), this Court's Local Rule 72.1, and Standing Order 08-01 (N.D. Ga. June 12, 2008).  The Clerk, therefore, is **DIRECTED** to terminate the reference to the Magistrate Judge.

**SO RECOMMENDED**, this 10th day of May, 2013.


JANET F. KING
UNITED STATES MAGISTRATE JUDGE

41